IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 07 C 5457 |
| EFRAIN ORTEGA, | ) ) ) | Judge Virginia M. Kendall |
| Plaintiff-Intervenor | ) ) | |
| v. | ) ) | |
| CAST PRODUCTS, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff the United States Equal Opportunity Employment Commission ("EEOC") filed suit against Defendant Cast Products, Inc. ("Cast") claiming that Cast discriminated against Plaintiff-Intervenor Efrain Ortega ("Ortega") on the basis of his disability in violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Specifically, the EEOC claims that Cast failed to provide reasonable accommodations for Ortega's diabetes and that Cast terminated Ortega because of his diabetes. Pursuant to Fed. R. Civ. P. 56, Cast has moved for summary judgment. For the reasons stated, Cast's Motion for Summary Judgment is granted in part and denied in part. With respect to the claim for failure to accommodate, the motion is denied. With respect to the claim for discriminatory termination, the motion is granted.

1

**STATEMENT OF UNDISPUTED FACTS**

Cast employed Ortega as a die cast machine operator beginning in 1988, where he used a die cast machine to fabricate various parts. (Pl. 56.1 Resp. ¶ 1; Def. 56.1 Resp. ¶ 6.)[1] To perform his job, Ortega would place a piece of metal into the die cast machine, allow the machine to shape the metal into a part, and then remove the finished product from the machine. (Pl. 56.1 Resp. ¶ 13.) Ortega held that job until Cast terminated his employment on March 8, 2006. (Pl. 56.1 Resp. ¶¶ 1, 3.) On July 21, 2003, Ortega learned that he had diabetes. (Pl. 56.1 Resp. ¶ 7.) At that time, his doctor sent a note to Cast which indicated that Ortega may require accommodations for his diabetes. (Pl. 56.1 Resp. ¶ 9.) Starting in the winter months of 2004, as a result of his diabetes, Ortega had to urinate frequently—as frequently as once every fifteen minutes. (Def. 56.1 Resp. ¶¶ 9, 10; Pl. 56.1 Resp. ¶ 11.)[2] Depending on the level of his blood sugar, as little as two or three minutes would pass from the time that Ortega first felt the urge to urinate and the time that he actually had to relieve himself to avoid involuntary urination. (Def. 56.1 Resp. ¶ 11.) On January 12, 2005, Ortega gave Cathy Haener ("Haener"), the head of Cast's Human Resources Department, a note from his doctor indicating that Ortega could not work overtime hours. (Pl. 56.1 Resp. ¶¶ 4, 10.) Cast honored the

---

[1] Citations to "Plaintiffs' Response to Defendant's Statement of Undisputed Facts" have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to "Defendant's Response to Plaintiffs' Rule 56.1 Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp. ¶ __."

[2] In its Response to Plaintiffs' Rule 56.1 Statement of Additional Facts, instead of admitting or denying certain statements of fact, Cast responded, "Cast neither admits, nor denies, as Cast was not aware of this at any time before termination . . . ." without citation to the record. Under the Local Rules of this District, "[a]ll material facts set forth in the statement [of additional facts] will be deemed admitted unless controverted by the statement of the moving party." L.R. 56.1(a). In order to controvert the statement of additional facts, the moving party must include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to . . . the record." L.R. 56.1(b)(3)(B). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)). Accordingly, the Court deems the following paragraphs of Plaintiffs' Rule 56.1 Statement of Additional Facts admitted: 9, 10, 11, 12, 27, 28, 29, 30, 31 and 32.

doctor's request and did not require Ortega to work overtime hours after it received the note. (Pl. 56.1 Resp. ¶ 59.) The note did not refer to diabetes or frequent urination. (Pl. 56.1 Resp. ¶ 10.)

As a result of his diabetes, Ortega had to get up approximately four or fives times each night to urinate. (Def. 56.1 Resp. ¶ 28.) When driving his car, if Ortega felt the need to urinate, he would pull over to the side of the road and urinate into a cup that he would empty when he returned home. (Def. 56.1 Resp. ¶ 29.) Because of his frequent urination, Ortega would not drive more than thirty minutes at a time or take public transportation. (*Id.*; Def. 56.1 Resp. ¶ 30.) The frequent urination also prevented Ortega from serving on a jury, attending concerts and attending his daughter's school activities. (Def. 56.1 Resp. ¶ 32.)

After developing the symptom of frequent urination, Ortega involuntarily urinated on himself while he was at work on two separate occasions. (Def. 56.1 Resp. ¶ 12.) To avoid embarrassment, he brought a cup to work so he could relieve himself near his work station in case he could not make it to the restroom before urinating involuntarily. (*Id.*) For approximately one year, Ortega emptied the urine from his cup into a drain on the factory floor about four or five times each day. (Pl. 56.1 Resp. ¶ 26; Def. 56.1 Resp. ¶ 18.) He never considered wearing a protective undergarment or "adult diaper" while he was at work. (Pl. 56.1 Resp. ¶ 16.) During this time, no supervisor at Cast required Ortega to ask for permission prior to using the restroom or told him that he could not leave his work station to use the restroom. (Pl. 56.1 Resp. ¶ 37.) Before his termination on March 8, 2006, Ortega had not spoken with Haener about his frequent urination or asked her for an accommodation, such as relocation to a work station closer to a restroom. (Pl. 56.1 Resp. ¶¶ 18, 32, 34.) Nonetheless, before his termination, no one at Cast expressed dissatisfaction with Ortega's level of productivity. (Pl. 56.1 Resp. ¶ 37.)

3

On March 8, 2006, Jose Ortiz ("Ortiz"), Ortega's supervisor, noticed Ortega supporting himself with his left arm against his die cast machine, looking around the surrounding factory area. (Pl. 56.1 Resp. ¶¶ 6, 28.) Ortiz then saw Ortega expose his penis and urinate near his work station. (*Id.*) After observing Ortega urinate, Ortiz reported the incident to Haener. (Pl. 56.1 Resp. ¶ 31.) Haener then informed Operations Manager Jeff Adams ("Adams") of the allegations against Ortega. (Def. 56.1 Resp. ¶ 35.) Haener and Adams determined that Ortega should be fired if he actually urinated while on the factory floor. (*Id.*; Haener Dep. at 101:9-15.) Later that day, Haener held a meeting with Ortiz and Ortega to discuss the incident. (Pl. 56.1 Resp. ¶ 34.) At the meeting, Haener informed Ortega of the allegations against him. (Def. 56.1 Resp. ¶ 34.) Without informing Haener that diabetes caused him to urinate with great frequency and urgency, Ortega admitted that he urinated while he was on the factory floor, but he claimed that he urinated into a cup, not into the scrap metal bin. (*Id.*) Haener then terminated Ortega's employment for public urination and property damage to Cast's plant, telling him that "pulling out your penis and urinating in the middle of a plant is unconscionable and unreasonable." (*Id.*; Pl. 56.1 Resp. ¶ 31; Haener Dep. at 65:13-18.) The next day, March 9, 2006, Haener learned for the first time that diabetes caused Ortega to urinate frequently. (Pl. 56.1 Resp. ¶¶ 19, 35.)

Subsequently, Ortega found a job as a machine operator for Frank's Welding on March 15, 2007. (Pl. 56.1 Resp. ¶ 24.) On September 27, 2007, the EEOC filed suit against Cast alleging failure to accommodate and discriminatory termination. (Compl. ¶¶ 9, 12.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

4

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

The ADA prohibits discrimination in the terms, conditions and privileges of employment against "a qualified individual with a disability because of the disability of such individual." *See* 42 U.S.C. § 12112(a). A court must begin its analysis of ADA claims by assessing whether the plaintiff is disabled within the meaning of the ADA. *See Burnett v. LFW, Inc.*, 472 F.3d 471, 483 (7th Cir. 2006). A person has a disability under the ADA when a physical impairment substantially

5

limits at least one of the person's major life activities. *See* 42 U.S.C. § 12102(1)(A).[3] Diabetes is a recognized impairment under the ADA. *See Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004). Whether an impairment gives rise to a disability under the ADA is a fact-specific inquiry that requires the Court to assess the effect that the impairment has on an individual's major life activity; therefore, diagnosis of an impairment alone is not sufficient to establish the existence of a disability within the meaning of the ADA. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).

Ortega claims that diabetes affects his major life activity of waste elimination. While the Seventh Circuit has not addressed whether eliminating bodily waste is a major life activity, other courts have recognized that waste elimination is a major life activity under the ADA. *See, e.g., Heiko v. Columbo Savings Bank*, 434 F.3d 249, 255 (4th Cir. 2006) ("[E]very circuit court to address the issue has concluded that waste elimination is a major life activity."); *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 384 (3d Cir. 2004); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); *Erjavac v. Holy Family Health Plus*, 13 F.Supp.2d 737, 747-48 (N.D. Ill. 1998) (Castillo, J.) ("Eating and waste elimination are both essential to remaining alive."). The parties do not dispute that waste elimination constitutes a major life activity under the ADA. Therefore, Ortega is an "individual with a disability" if diabetes substantially limits his major life activity of eliminating waste.

---

[3] The Court notes that effective January 1, 2009, Congress amended the definition of "disability" under the ADA. *See* The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008). Although the ADAAA is now effective, courts "use the laws and interpretations that were in force when the complained-of acts occurred." *Kiesewetter v. Caterpillar Inc.*, 295 Fed.Appx. 850, 851 (7th Cir. 2008) (applying pre-ADAAA definition of "disability") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)). Therefore, in analyzing whether Ortega qualifies as an individual with a disability, the Court will apply the pre-ADAAA definition of "disability."

The impairment does not need to cause an utter inability to perform a major life activity in order to constitute a "substantial limitation" under the ADA. *See Branham*, 392 F.3d at 902 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998)). An individual's ability to perform a major life activity is substantially limited if the individual is unable to perform the activity or is significantly restricted as to the condition, manner or duration under which he can perform it, as compared to an average person in the general population. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 781 (7th Cir. 2007) (citing 29 C.F.R. § 1630.2(j)(1)). To determine whether an impairment substantially limits an individual's ability to perform a major life activity, courts consider the nature and severity of the impairment, the actual or expected duration of the impairment and the anticipated permanent or long-term impact of the impairment. *See Davidson v. Middlefort Clinic, Ltd.*, 133 F.3d 499, 506 n.3 (7th Cir. 1998). Other courts have found that individuals could be substantially limited in the major life activity of waste elimination when their impairment causes the frequent and urgent need to eliminate waste. *See, e.g., Workman*, 165 F.3d at 467 (employee's spastic colon could have substantially limited major life activity of waste elimination when employee needed to use restroom immediately whenever she felt the urge); *Wirtz v. Ford Motor Co.*, No. 05-40324, 2008 WL 565260, at *2, *4 (E.D. Mich. Feb. 28, 2008) (Gadola, J.) (employee's irritable bowel syndrome and muscoskeletal spasms could have substantially limited her ability to eliminate waste because the condition required her to have restroom access "frequently and without delay"); *Erjavac*, 13 F.Supp.2d at 747 (employee's diabetes could have substantially limited major life activity of waste elimination because "the average adult does not need such frequent access to the bathroom that they soil themselves while waiting to use it . . . ."). The Court agrees that the frequent and urgent need

7

to urinate could substantially limit an individual's performance of the major life activity of waste elimination.

With respect to the nature and severity of Ortega's impairment, the record shows that diabetes caused Ortega to urinate frequently. Depending on his blood sugar levels, he would need to urinate every fifteen minutes. On several occasions, Ortega involuntarily urinated on himself when he could not make it to the restroom in time to eliminate waste in the same manner as an average person in the general population does–by using the restroom. Because such a short time would pass after he first felt the urge to urinate and the point where he would involuntarily urinate on himself if he did not reach a restroom, Ortega avoided activities that required him to be without easy access to restrooms, such as driving for longer than thirty minutes, serving jury duty, attending his daughter's school functions and riding public transportation. Based on that evidence, a reasonable jury could conclude that Ortega must eliminate waste with more frequency and urgency than a person within the general population. Additionally, diabetes is a chronic disease that does not have a cure. Therefore, the expected duration of Ortega's impairment is the remainder of his life.

Although Cast concedes that Ortega's diabetes requires him to frequently urinate, Cast claims that Ortega cannot be substantially limited in the major life activity of waste elimination because he does not have difficulty actually removing bodily waste. To support this contention, Cast points to situations where a person's inability to eliminate bodily waste gave rise to a finding that the person was substantially limited in the major life activity of waste elimination. *See Heiko*, 434 F.3d at 257 (plaintiff required dialysis to eliminate toxins from blood); *Fiscus*, 385 F.3d at 383-85 (plaintiff's kidney failure required her to undergo dialysis to eliminate bodily waste). While the

8

plaintiffs in those cases experienced substantial limitations on their ability to eliminate waste because their bodies were not capable of eliminating waste on their own, those are not the only possible situations where a person could suffer a substantial limitation in the major life activity of waste elimination. The ADA does not require an inability to perform a major life activity before an individual meets the statutory definition of "disabled." *See Bragdon*, 524 U.S. at 641 (The ADA "addresses substantial limitations on major life activities, not utter inabilities."); *Squibb*, 497 F.3d at 781 ("[A]n individual is substantially limited in [a major life activity] if she is unable to perform such an activity *or* is significantly restricted as to the condition, manner or duration under which she can perform it as compared to an average person in the general population.") (emphasis added). Ortega has put forth evidence that would permit a reasonable jury to conclude that his frequent and urgent need to urinate significantly restricts the manner or condition in which he can perform the major life activity of waste elimination because he requires more frequent and immediate access to a restroom than an average person in the general population.

Cast contends that urinary incontinence cannot give rise to a disability under the ADA. To support its argument, Cast relies on *Gratzl v. Chief Judges of the 12th, 18th, 19th and 22nd Judicial Circuits*, No. 07 C 0867, 2008 WL 2840566 (N.D. Ill. July 22, 2008) (St. Eve, J.). In *Gratzl*, a court reporter who suffered from urinary incontinence required frequent access to a restroom during work hours. *See id.* at *2. After providing a note from her doctor stating that her medical condition required her to be close to a washroom and that she needed to get to a restroom at a moment's notice, the reported asked for assignment to the court's control room. *See id.* at *3. Instead, the chief judge offered her a rotation that would allow her to work in the five courtrooms that were closest to the restrooms. *See id.* The reporter refused the assignment and filed suit under the ADA

9

for failure to accommodate. *See id.* at *4. In granting summary judgment against the reporter, the *Gratzl* Court found that the impairment, urinary incontinence, did not substantially limit the major life activity of waste elimination because the reporter's "inability to eliminate waste is a characteristic of her incontinence, and thus is not sufficiently distinct or separate from her impairment." *Id.* at *8.

Incredibly, Cast claims that *Gratzl* essentially overturned *Erjavac* and that "*Gratzl* is the applicable precedent that should be applied." In *Erjavac*, another court within this district denied the employer's motion for summary judgment in an ADA discrimination case, finding that a reasonable jury could find the employee disabled when the employee's diabetes required the employee to make frequent trips to the restroom immediately upon feeling the urge to urinate. *See Erjavac*, 13 F.Supp.2d at 741, 749. Ignoring that one district court does not have the ability to overturn another district court's ruling, even if *Gratzl* was controlling authority for this Court, it would not be applicable to Ortega's situation. To determine whether a person has a disability under the ADA, a court must evaluate the effect of the individual's impairment on the individual's ability to perform a major life activity. *See Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001) (requiring analysis of affected life activities rather than characteristics of the impairment). In *Gratzl*, the reporter claimed that her impairment, urinary incontinence, substantially limited her ability to eliminate waste. However, the *Gratzl* Court rejected that claim because the inability to eliminate waste is merely a characteristic of incontinence, and not an activity sufficiently distinct or separate from the impairment, stating that the argument "that her incontinence, namely, her inability to control the bodily function of urinating, limits her ability to control her urination . . . is a circular argument at best." *See Gratzl*, 2008 WL 2840566, at *8. In contrast, Ortega does not contend that

his impairment is urinary incontinence; rather, he claims that diabetes substantially limits his ability to eliminate waste. The characteristics of diabetes include an inability to regulate blood sugar levels. *See Branham*, 392 F.3d at 898 (describing characteristics of diabetes). Although diabetes can cause frequent urination, waste elimination is a life activity sufficiently distinct from the blood sugar characteristics of diabetes that frequent urination is not a mere characteristic of the impairment in the same way that a lack of bladder control is a characteristic of urinary incontinence.

Because a reasonable jury could conclude that diabetes substantially limits Ortega's ability to eliminate waste, the Court cannot find that Ortega is not disabled under the ADA as a matter of law. Therefore, the Court must determine whether the undisputed facts show that Cast complied with the ADA's substantive requirements.

I. Failure to Accommodate

The ADA requires that employers make reasonable accommodations for an employee's known disability. *See* 42 U.S.C. §§ 12112(b)(5)(A), 12112(a). In order to prevail on a failure to accommodate claim under the ADA, the employee must show: 1) that he is a qualified individual with a disability; 2) that the employer was aware of the disability; and 3) the employer failed to reasonably accommodate the disability. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 529, 545 (7th Cir. 2008). The parties agree that Cast did not provide Ortega with an accommodation for his frequent urination.

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that he holds . . . ." 42 U.S.C. § 12111(8); *Mobley*, 531 F.3d at 545. Therefore, an employee with a disability who can perform the essential functions of his job and meet his employer's expectations

11

is a "qualified individual with a disability" under the ADA. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). Here, the parties have not disputed whether Ortega can perform the essential function of his job or whether he has met Cast's performance expectations. Nothing in the record suggests that Ortega cannot perform the essential function of his job, operating a die cast machine. Additionally, it is undisputed that Cast never expressed dissatisfaction with Ortega's productivity levels. Therefore, viewing the evidence in the light most favorable to Ortega, Cast has failed to demonstrate that Ortega is not a "qualified individual with a disability" as a matter of law.

Under the ADA, the employee seeking accommodation bears the initial duty of providing the employer with notice of the disability. *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803-04 (7th Cir. 2005). In most cases, the employee must inform that employer that he has a disability and desires an accommodation. *See Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("Although there will be exceptions to the general rule . . . the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."). Informing a direct supervisor of a disability satisfies the employee's initial duty of providing the employer with notice of the disability. *See Gile v. United Airlines, Inc.*, 213 F.3d 364, 369, 373 (7th Cir. 2000) (finding that employee fulfilled the ADA's notice requirement when she informed her immediate supervisor that she suffered from depression and needed a shift transfer). After the employee provides the employer with notice, the employer and the employee must engage in an interactive process to evaluate the extent of the disability and the possibility of accommodating the disability. *See Sears*, 417 F.3d at 804.

The parties agree that Ortega never informed Haener or anyone else within Cast's Human Resources Department that diabetes caused him to urinate frequently while he was at work. The undisputed facts show that he immediately informed Cast that he had diabetes when he learned of the diagnosis on July 21, 2003. Additionally, on January 12, 2005, Ortega informed Haener that he could not work overtime hours on account of his diabetes. Although he began to experience frequent urination as a result of his diabetes in the winter months of 2004, the January 12, 2005 letter did not mention frequent urination. The parties agree that Haener did not learn of Ortega's frequent urination until March 9, 2006, the day after Haener terminated Ortega for urinating while on the Cast factory floor.

While the parties agree that Haener did not receive notification regarding Ortega's frequent urination before his termination date, Ortega claims that he discussed the condition with Ortiz, his direct supervisor. Specifically, Ortega contends that he had three conversations with Ortiz about his frequent urination from October 2005 through December 2005. (Def. 56.1 Resp. ¶ 16.) He claims that he first approached Ortiz to discuss his frequent urination immediately after he involuntarily urinated on himself at work while attempting to reach the restroom from his work station. (Def. 56.1 Resp. ¶ 13.) During that conversation, Ortega informed Ortiz that a very short amount of time passes from the time that he first feels the urge to urinate until he cannot control his bladder, and that after he first felt the urge, he could not secure his machine and walk to the restroom before involuntarily urinating on himself. (*Id.*) Ortega then explained that he urinated into a cup at his workstation whenever he felt that he could not make it to the restroom before losing control of his bladder. (*Id.*) To remedy the situation, Ortega asked Ortiz to move his work station closer to the restroom. (Def. 56.1 Resp. ¶ 15.) Ortiz refused and told Ortega that he could continue

13

urinating into the cup at his workstation as long as the "big bosses" did not see him. (Def. 56.1 Resp. ¶ 14.)

Ortiz disagrees with Ortega's description of their interactions. He denies that he ever had a conversation with Ortega regarding frequent urination. (Def. 56.1 Resp. ¶¶ 15-17.) Additionally, Ortiz claims that he did not even know about Ortega's frequent urination until he saw him urinate near his work station on March 8, 2006. (Def. 56.1 Resp. ¶ 17.) Therefore, Ortiz and Ortega dispute whether Cast received notice of Ortega's frequent urination. Because Ortiz served as Ortega's direct supervisor, if Ortega informed Ortiz that he had difficulty making it to the restrooms at work before losing control of his bladder because of the distance between his work station and the restroom, then the ADA would have required Cast to explore potential ways to accommodate that problem. However, if Ortiz did not receive notice of Ortega's frequent urination at work, then Cast would have been under no obligation to explore accommodations with Ortega. Therefore, a genuine dispute of material fact exists as to whether Cast received notice from Ortega regarding the frequent urination that he experienced at work as a result of diabetes. Accordingly, Cast has not shown that it is entitled to judgment as a matter of law with respect to Ortega's claim for failure to accommodate his frequent urination.

II. Discriminatory Discharge

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a). An employment decision is "because of the disability" when the plaintiff's disability was a motivating factor behind the decision. *See Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1033 (7th Cir. 1999). Therefore, for an employer to be liable under the ADA for

discriminatory discharge, the disability must be "the catalyst which prompted the employer to take the adverse employment action, and a factor without which the employer would not have acted." *Id.* at 1034. Of course, in order for a disability to be a motivating factor behind the decision to terminate an employee, the decision maker must have knowledge of the disability. *See Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("If it does not know of the disability, the employer is firing the employee 'because of' some other reason.")

Here, the undisputed facts show that Haener did not learn that diabetes caused Ortega to frequently urinate until March 9, 2006, the day after she terminated him for urinating while he was on Cast's factory floor. Because Haener did not know of Ortega's disability on March 8, 2006 when she fired him, she could not have fired him because of his disability.

Despite the fact that Haener did not know of Ortega's disability when she fired him, the EEOC contends that Ortiz held a discriminatory animus towards Ortega that should be imputed to Haener's termination decision. To demonstrate a causal connection between membership in a protected class and an adverse employment action, the plaintiff "must provide direct or circumstantial evidence that the *decision maker* has acted for a prohibited reason." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original). Nonetheless, courts impute the discriminatory animus of a subordinate employee to the decision maker when the subordinate employee possesses so much influence that he essentially transforms himself into the functional decision maker or when the subordinate employee supplies misinformation to the decision maker. *See Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007). However, when the employer's "ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Willis v. Marion County Auditor's Office*, 118 F.3d 542,

547 (7th Cir. 1997); *see also Brewer*, 479 F.3d at 918 ("[A]n independent investigation absolves the employer of liability.").

As discussed previously, a dispute exists regarding whether Ortiz had knowledge that diabetes caused Ortega to urinate frequently. If Ortiz did not know, then he could not have held discriminatory animus towards Ortega on the basis of Ortega's disability. If Ortiz did know, then it is possible that he held discriminatory animus towards Ortega; however, no evidence in the record suggests that Ortiz fostered such an animus towards Ortega. Ortega concedes that no Cast employee ever expressed discriminatory sentiments towards him regarding his disability and that no one at Cast exposed him to ridicule or humiliation regarding his need to urinate frequently. (Pl. 56.1 Resp. ¶ 36.) Therefore, even if Ortiz had knowledge of Ortega's disability, the record contains no evidence that would permit the inference that Ortiz harbored a discriminatory animus towards Ortega on the basis of his disability that the Court could impute to Cast.

Furthermore, even if Ortiz held a discriminatory animus towards Ortega on the basis of his disability, the undisputed facts show that Haener did not rely exclusively upon Ortiz's version of the events in making her decision to terminate Ortega. Haener held a meeting with Ortega to discuss the events of March 8, 2006 on the Cast factory floor. During that meeting, Haener asked Ortega whether he urinated near his work station instead of in a restroom. Ortega responded by admitting that he urinated near his work station. Accordingly, even if Ortiz held a discriminatory animus towards Ortega, it would be inappropriate to impute that animus to Haener because she made an independent inquiry to determine that Ortega had urinated near his work station. After Ortega admitted that he had urinated while he was near his work station, Haener terminated his employment because he had exposed his penis and urinated while he was on Cast's factory floor. Therefore,

Haener arrived at her ultimate decision to terminate Ortega independent of any bias that Ortiz held against Ortega because of his disability. Because an independent investigation absolves the employer of a subordinate's discriminatory animus, even if Ortiz held a discriminatory animus towards Ortega, that animus would not be imputed to Cast. Therefore, the undisputed facts show that Cast is entitled to judgment as a matter of law with respect to the claim for discriminatory discharge.

## CONCLUSION AND ORDER

For the reasons stated, Cast's Motion for Summary Judgment is granted in part and denied in part. With respect to the claim for failure to accommodate Ortega's disability, the motion is denied. With respect to the claim for discriminatory discharge, the motion is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 9, 2009